Team, Medicines Company v. Mylan. Hey, Ms. Wadmore. May it please the Court, Shannon Bloodworth for the Mylan, for Mylan. During the Huss-Biro argument... Could I just ask a preliminary question so I'd be sure that I don't forget it? Is Mylan's position the same as Huss-Biro's, that even if we were to find non-infringement, that we have to go on and reach the invalidity issues? If the Court construes the 727 patent to have an efficient mixing requirement and affirms the 343 finding of non-infringement of summary judgment, then Mylan does not believe the Court needs to reach the additional issues that were briefed in our papers. Okay. Now, Your Honor, you asked a hypothetical question during the Huss-Biro argument about 31 batches and whether or not you would have to have 31 batches to know whether or not you infringed the patents that suit. And in answer to that question, TMC's counsel referred repeatedly to the efficient mixing process. And I think that really cuts to the heart of the issue here. If right now I brought in a batch of Bivalarudin with an Asp9 level of 0.4% and set it down, there would be no way of knowing whether or not that was an original Angiomax batch of 0.4% or an improved batch of Angiomax with less than 0.4%. In order to determine the answer to that question, you have to ask two questions. First, how was the batch made? And two, will that process always result in Asp9 levels of less than 0.6%? And that is the characteristics. That's the demarcation between the prior art and the patents in suit that TMC drew. All prior art batches did not have Asp9 levels of less than 0.6%, when in fact we know that 87% of the 87 prior art batches did have an Asp9 level of 0.6% or less. I want to ask the same question that I asked of Mr. O'Leary. Is this batch construction really right and workable? I understand the argument that 727 has to have an efficient mixing limitation, under a correct interpretation, but is the district court's batch construction really correct here? Because, as Judge Wallach has been asking, Heidegger is cat, right? And that problem could be avoided by a different construction of batches, so that you didn't have to look to the future to see whether there was infringement raising these problems of indefiniteness. I know both district courts here reach the same construction. We have law which says that even if the parties agree on a construction, we don't have to follow it. That's the Lubrizol case. Maybe this is an instance in which the batches construction isn't correct. It's a challenging question, and I think we struggled with it clearly in our Markman papers. The heart of it comes down to how do you draw this line between the prior art and improved angiomax? Well, it would be in line if both patents had an efficient mixing requirement, right? If both patents had an efficient mixing requirement, then yes, that would be the line. I think that if you compare example four to example five, the only two parameters in those examples that changed were how you add the pH adjusting solution and how you mix it. In example four, you add it quickly or all at once, and you have a paddle mixer or two that is at a very slow RPMs. In example five, you add it in a controlled manner, and you have a homogenizer, a high-shear mixer, and that gives you a more efficient mixing product. Here, I don't think there's any dispute that Milan doesn't have... Example four, we add it all at once, and we have a slow paddle mixer at 200 RPMs. If there was an efficient mixing requirement in both the 343 and the 727 patent, we would not be here today. Maybe I guess TMC would have appealed, but we wouldn't be here as appellants today. I do think the pharmaceutical batches of this idea of consistency across all the old prior art and all the future batches to be made does introduce an element of uncertainty that is irreconcilable with how do you keep the parity between analyzing invalidity under the 102 on-sale bar and infringement. Particularly when TMC readily acknowledges it took them 25 batches before they even recognized that they had an invention here. So is it 25 batches? The first 12 batches they sold all had less than 0.6% S9 under the old process. It's a conundrum, and certainly I think we have a footnote in our yellow brief. Once Nautilus was issued, which was post our briefing in the district court and here originally in the initial briefing, there is a zone of uncertainty about what do you actually know as a person of ordinary skill in the art, and more importantly as a company who wants to make this product under the prior art process. Where really are you treading upon the grounds of infringing or not? And that is tied, I think, directly to the pharmaceutical batches limitation, or rather construction that is taken from the patent specification. How does the district court's construction of pharmaceutical batches differ from the position you took below? Can you repeat the question? Sure. Didn't you argue for the pharmaceutical batches construction that the district court adopted? We took the specifications argument and then we thought that there was an antecedent basis that was missing and did add an extra component that it had to be by a said compounding process, and the district court adopted that. And we believed that because it also includes various embodiments, that that by a said compounding process must be efficiently mixing. And when we got into summary judgment briefing, the district court then ruled for the first time and did some derivative claim construction and found that the 727 patent was a pure product patent, which is inconsistent with the construction adopted of pharmaceutical batches, which does have a process component to it. Where is the batches language in this specification? Let's say the 727 patent. I have the brief one. Round column five. Thank you. Column five lines 24 through 36, Your Honor. Couldn't that be construed to mean that it's got to be a representative batch, not that you have to look at all batches to see whether there's infringement? It's not 100% clear, right? The only thing that brings all the future batches into play is that last sentence on line 35, right? Well, it's a representative batch, but it's also that all batches have to be less than 0.6% in the final clause of the claim one of the 727 patent itself, wherein all batches are less than 0.6%. Ask nine. I was paraphrasing claim one. Well, it doesn't say all batches. It says e-batches. But it could be talking about batches that are produced by this process. And if it is one representative batch, which is what the district court found in the Myelin case is sufficient, we would argue, at least we do argue, that that one representative batch is representative of our entire Ask Nine specification of 0 to 1%. And that clearly if you practice inefficient mixing, what the patent teaches you is that you will have a batch that goes greater than 0.6%. It might take 26 of your 87 lots or 27 or 29, but you will get there. It's a very high percentage of prior art batches that had less than 0.6% at or below 0.6% Ask Nine. So is it representative? It's representative of the entirety of what Myelin will make. And to determine that inquiry, you have to look at the process by which Myelin makes it. And Myelin clearly dumps in all the pH adjusting solution all at once and mixes very slowly at 200 RPMs with a paddle mixer. And that was not disputed. Those two facts were not disputed by TMC. So, Your Honor, those are the reasons why we do believe that there's no way to untangle the process from the patent itself, as far as that is concerned. The other point I did want to move to if it was just also with our and was talked a little bit about in the Hospiro argument as well, is the disavowal that took place. TMC filed a petition to make special, which is an accelerated process in the patent office. They took advantage of that. They had to bring their best prior art forward and preempt it. And that petition made it quite clear their invention was the process by which the product was made. And for that reason, we also think the 727 patent has an efficient mixing component to it. Your Honor, if you do not have any further questions, I'll reserve my time for rebuttal. Okay. Thank you. Thank you. Mr. Fleming? Good morning, Your Honor. Porter Fleming also on behalf of the Medicines Company. If I may, I'd like to address a question you keep asking, Your Honor, about consistency. I don't think Claim 1 of the 727 requires consistency. The language of Claim 1 says all batches. And that's what distinguished it from the prior art. You have prior art batches. If one were to interpret the claim as including an efficient mixing requirement, that would distinguish it from the prior art. Without getting into this problem that you have, if you have to look to determine whether there's infringement at future batches that are produced, I mean, wouldn't a more reasonable construction of batches to mean that it has to be a representative batch and not that you have to look to future batches to see if there's infringement? Well, first of all, Your Honor, I don't believe Claim 1 of the 727 requires efficient mixing. It's a product claim. It was issued by the Patent Office as a product claim. The reasons for allowance from the examiner was a patent claim. The prior art that was being distinguished over was a product, the TOVI API. And we were required to add a specific limitation, having a base, and that distinguished API. I understand that, and you'll have time to argue that. But let's just stick with the batches thing for a minute, because it does seem to me very odd to have a claim that says in order to determine infringement, you have to look to future production to determine whether there's been infringement. And that does seem to me to create a potential indefiniteness problem, which one would avoid if you gave the representative batch construction to this. I think, Your Honor, pharmaceutical batches requires either a representative batch or you look at all batches made by a compounding process. I don't think you have an issue about some future 31, 38 batch. I can tell counsel said she puts a product on the table. I can measure that product, and I can get an AST-9 value. If that AST-9 value is below .6, that product infringes, and it meets the other limitations of Claim 1 of the 727. That infringes. If they make a second batch under the same process, I can look at that. I can measure that. If it has an AST-9 below a maximum of 0.6, it too infringes. Every batch infringes as long as you keep making under the same process and you keep having an AST-9 below 0.6. I will agree that with respect to the 343 patent, which is a product by process claim, that in that claim, you do need efficient mixing. If you meet the limitations of efficient mixing. So what happens when your 21st batch exceeds 0.6? Assuming you've used the same process, and we're talking about 727 patent, which in our view has no efficient or inefficient limitation, then all those batches don't infringe. You found a dead cat, in other words. But the problem is that we know that these processes everyone's using are efficient. They are getting better. The nature is that you are perfecting. There's evidence in this case that Mylan, they made a first batch to CBM 0901. It had a 1.33 AST-9 level. They said it was not representative. They went back. They improved. They actually called it better stirring, efficient stirring. And that had an AST-9 value of 0.3 or 0.2. And we know. And the court found, Judge Sandy found, that that was representative. And they found that that infringed under Synovion. And then, Judge Hughes, you asked a question about what if someone changed something. Synovion actually addresses that very question. That's not the inquiry, if you might do something in the future. In Synovion, it had a limit of, I think it was 0 to 0.6, was the spec. Is your position that in the example of 31 batches, that you can't tell whether batch 16 infringes until you produce all 31 batches and see that they're all within the 0.6 limitation? If batches 0 or 1 to 16, if they're all below 0.6, they infringe. 17 infringes, 18. I agree that if you get to 31, then it changes. Something you have to look, perhaps, at what changed in the process. Maybe something's different. Maybe it wasn't the same process. But if you use the same process and you have AST-9 levels below 0.6, you infringe. If you use the same process and 31 doesn't infringe, does that mean retroactively that the process itself is inefficient? I'm sorry, if 31 is over 0.6, it's non-infringing. You say, well, then the other batches aren't infringing. Does it also mean that the process used on its face must have been inefficient, assuming it's the same, not that there's an aberration that we talked about before? I think you'd have to look. The fission mixing is actually a mixing step within the compounding process. And so our construction is minimizing AST-9s. If you would look at what the AST-9 was at that level, or at that stage perhaps, but I think it would not fall within the claim because you'd have a maximum AST-9 above 0.6. But let me try to be clear because I don't want the record to be unclear about this. You have 31 batches that are accused of infringing batch 16, and batch 31 is out of spec and it's over 0.6. Does that change the fact that 16 infringes? At the time you made batch 16 and you measured the AST-9 and it was below 0.6 and assuming 1 to 15 or 1 to 16 are all below 0.6, those infringe. I'm agreeing that if you make a future batch, batch 31, then one would argue, and that's what the prior art was. The prior art was the 89 batches. And that's why the claim limitation requires all. I'll try to answer my question specifically. Does batch 16 infringe if batch 31 does not? The claim says pharmaceutical batches, you look at all. So all the batches would not infringe. None of the batches infringes. Claim says all. If one does not infringe. Correct. Okay. And you're not bothered by the word may in the patent. The word may include. In that last sentence, as I recall, it says may include. I think the may is the either or. So if you have a representative exhibit batch like the ANDA situation, you look at that one batch and you look for its representative qualities with respect to AST-9 levels, impurities, et cetera. If you've made more than one batch, the claim, as defined, you have to look at all. But you can do it. You can measure. So you know whether you're in or you're out. It's not indefinite. Well, you can't. When you're making batch 16, you can't determine whether you're in or out. You can measure the AST-9 of 16. Yes, you can, Your Honor. And if it has a .6. It doesn't infringe if 31 doesn't. You can't tell whether 16 infringes until you produce all 31 batches. But that's the definition of pharmaceutical batches, all batches. I agree with that. Okay. I'd like to go back just a bit on whether the pharmaceutical batches include sufficient mixing. Because I don't think it does. And we heard about a clear avowal. There was no disavowal. And actually it's in our papers. But the argument is that there was a TOBI reference which was being cited. It was API. It was a product. And that when that product was not differential from the product of the 727. And when you looked at the product of the 727, including a base and other properties, it was different. And the prior art at the time was the 89 batches, all batches. And that was distinguishable, again, by the 727. And the district court in Illinois and the district court in New Jersey have both found that the pharmaceutical batches of the 727 goes just to a product. And we found in Illinois that myelin infringes that product. I would also like to raise, we had issues with respect to the summary judgment decision that Judge St. Eve had. And in that decision, she ruled on summary judgment that myelin's exhibit batch used more efficient mixing than example 4. She actually determined that myelin did not practice example 4. It was more inefficient. And we believe that to be a finding fact. She ignored material facts that we raised as to the properties and processes they used. And we believe that that should not have been decided on summary judgment. And we believe that should be vacated. I haven't heard anything about their enablement armament with respect to claims 2 and 3, so I'll leave that alone. I think our papers are sufficient on that. I will pass the baton unless you have another question. Okay, thank you. Thank you, Your Honor. A couple of points. Mr. Fleming's answers to the bench's questions actually highlight a key point, and it's in myelin's briefing. But how is it that you determine whether or not that 16th batch is infringing or whether or not that same 16th batch is invalidating for the on-sale bar? And that's the problem that this construction really raises, is that you're applying a standard for a hypothetical number of batches that are created in the future, but you already have the data according to TMC, so you can't retroactively apply that same analysis. So for the representative batch, TMC made batches that they called representative, put them on stability, and later sold them. Two of those batches had ASP9 levels of less than 0.6%. If representative, you just need one representative batch, that batch would be representative of all batches to be made. You need to look at the process by which it's made in order to determine whether or not you have an improved angiomax or original angiomax. And Judge Saineev did find that myelin's mixing process is more inefficient than Example 4. And she looked at the two criteria that were highlighted between Example 4 and Example 5 and made that finding. And Example 2 has differences in volumes between Example 2 and Example 4 and still calls it inefficient mixing. So to the extent the patent teaches what is inefficient mixing, it teaches what myelin's process is. And for that reason, we think her summary judgment motion should be affirmed. If Your Honors don't have any further questions. Thank you. Thank you. Thank you, Ms. Butterworth. And I thank both counsel the case is submitted. Thank you.